UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ ) | |
| IN RE: ) | CASE NO. 09-21484 (ASD) |
| ) | |
| MICHAEL T. BOTTICELLO ) | CHAPTER 7 |
| AND HANNELORE E. BOTTICELLO, ) | |
| ) | |
|     DEBTORS. ) | |
| _____) | |
| ) | |
| GAVINO CARTIERA AND ) | |
| MALGORZATA CARTIERA, ) | |
| ) | |
|     PLAINTIFFS, ) | ADV. PRO. NO. 09-02050 |
| v. ) | |
| ) | RE: ECF NO. 53 |
| MICHAEL T. BOTTICELLO AND ) | |
| HANNELORE E. BOTTICELLO, ) | |
| ) | |
|     DEFENDANTS. ) | |
| _____) | |

_____

APPEARANCES:

Barry A. Postman, Esq.                          Attorney for Plaintiffs
Cole, Scott & Kissane, P.A.
1645 Palm Beach Lakes Boulevard
2nd Floor
West Palm Beach, Florida 33401

Michael J. Melly, Esq.                          Attorney for Defendants
143 Oneco Avenue, #1
New London, Connecticut 06320

**MEMORANDUM OF DECISION ON PLAINTIFFS' THIRD AMENDED COMPLAINT
FOR DETERMINATION THAT DEBT IS NONDISCHARGEABLE**

ALBERT S. DABROWSKI, United States Bankruptcy Judge

## I. INTRODUCTION

In this adversary proceeding, Gavino Cartiera and Malgorzata Cartiera (hereinafter together, the "Plaintiffs") seek a determination of nondischargeability of debt arising from Michael T. and Hannelore E. Botticello's (hereinafter together, the "Debtors") 2004 sale to the Plaintiffs of real property consisting of a duplex house located at 28-30 Spur Lane, Newington, Connecticut (hereinafter, the "Property"). The poorly crafted and ill-defined nature of the five complaints filed in this proceeding is discussed in detail in Part III, Section A (Background - Procedural History), pp. 4-6, *infra*. *See also* p. 5, fn. 7, *infra*. As noted hereinafter, Trial proceeded on the *Third Amended Complaint for Determination that Debt is Nondischargeable* (hereinafter, the "Third Amended Complaint"), ECF No. 53[1], in which Plaintiffs asserted that the subject debt should be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(B),[2] *see* Third Amended Complaint, ¶23. However,

---

[1] References to "ECF No. __" refer to the docket of Adversary Proceeding No. 09-2050.

[2] Bankruptcy Code Section 523(a)(2)(B) provides:

    (a)     A discharge under section 727. . . of this title does not discharge an individual debtor from any debt–

          (2)     for money, property, services or an extension . . . of credit, to the extent obtained, by–

               * * * *

          (B)     use of a statement in writing--

              (i)     that is materially false;

              (ii)     *respecting the debtor's or an insider's financial condition;*

              (iii)     on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

              (iv)     that the debtor caused to be made or published with intent to deceive . . . .

it is now clear that the Plaintiffs intended to prosecute and proceed, as they did at Trial, on the basis of §523(a)(2)(A)[3] seeking a determination of nondischareability as a result of alleged false pretenses, false representations and/or actual fraud by the Debtors.

Having now considered the entire record of that Trial, the Court concludes that the Plaintiffs, *inter alia*, failed to satisfy their burden to establish that the Debtors' relevant representations and statements were false, and failed to establish §523(a)(2)(A)'s requisite of an intent to deceive. Accordingly, and for the additional reasons discussed hereinafter, a Judgment shall enter in favor of the Defendants – the debt at issue is subject to the Debtors' discharge**.**

## II.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §157(a) and (b)(1).  This is a "core proceeding" pursuant to 28 U.S.C. §157(b)(2)(I).

## III.  BACKGROUND

### A. Procedural History

On or about October 2, 2006, the Plaintiffs filed a complaint and thereby initiated a lawsuit in the Superior Court for the State of Connecticut, *Gavino and Malgorzata Cartiera, v. Michael Botticello and Hannelore Botticello,* Case No. CV-06-5002722S, Judicial District of New Britain at New Britain (hereinafter, the "State Court Action") seeking damages,

---

(Emphasis added). At Trial, the Plaintiffs offered no evidence of any false written statement *respecting the Debtors' financial condition.*

[3]Section 523(a)(2)(A) is discussed hereinafter at pp. 9-12.

attorney's fees and costs allegedly arising from the sale of the Property. Prior to a trial of

the State Court Action, the Debtors commenced Bankruptcy Case No. 09-21484 by the

filing of a voluntary petition pursuant to Chapter 7 of the United States Bankruptcy Code

on June 2, 2009, staying pursuant to the automatic stay of 11 U.S.C. §362(a), the State

Court Action. The Debtors received their general discharge on September 9, 2009.

On August 28, 2009, the Plaintiffs initiated the instant adversary proceeding by filing

a *Complaint for Determination that Debt is Nondischargeable* (hereinafter, the "Initial

Complaint"), ECF No. 1, specifically asserting therein that Plaintiffs' claim against the

Debtors is nondischargeable under *11 U.S.C. §523(a)(2)(B)*.[4] Initial Complaint, ¶23 The

Initial Complaint alleged that certain representations made to the Plaintiffs by the Debtors,

"were false and misleading, and were made either knowingly or recklessly, and with an

intent to deceive the Plaintiffs; or under a belief in their truth for which there was no

reasonable ground; with intent to induce the Plaintiffs to rely upon said representations;

and the [Debtors] knew or should have known that Plaintiffs were relying upon same."

Initial Complaint, ¶19. While the Initial Complaint's Adversary Proceeding Cover Sheet

(hereinafter, the "Cover Sheet") described the "Cause of Action" as founded on "11 U.S.C.

§523 [without reference to subsection (A) or (B)]", the Plaintiffs characterized the "Nature

of Suit" on the Cover Sheet by reference to 11 U.S.C. § 727(c), (d), and/or (e)

("Objection/revocation of discharge")[5] and Fed R. Bankr. P. 7001(1) ("Recovery of

---

[4]The Initial Complaint also alleged that "the Plaintiffs' have a valid claim under the Connecticut
Unfair Trade practices Act ("CULPA") . . . ".  Initial Complaint, ¶22.

[5]Subsection 727(c) provides opportunity, *inter alia*, for a creditor to object to entry of a the
general discharge; subsections (d) and (e) provide opportunity for a creditor, *inter alia*, to seek
revocation of a general discharge.

money/property"). In apparent recognition of this incertitude, the Plaintiffs filed an identical "Amended" Complaint, ECF No. 3, on August 31, 2009, except for the reference to the "Nature of the Suit" on the Cover Sheet substituting §523(a)(2) as the statutory basis for their requested relief. The Plaintiffs filed further amended complaints entitled *Amended Complaint for Determination that Debt is Nondischargeable* on March 16, 2010, ECF No. 35, a *Second Amended Complaint for Determination that Debt is Nondischargeable* on March 25, 2010, ECF No. 37, and, finally, the Third Amended Complaint on June 22, 2010, ECF No. 53.[6] Each of these Complaints, including the Third Amended Complaint, continued by the specific requests therein to seek a determination of nondischargeability pursuant to subsection (B) of 11 U.S.C. §523(a)(2).[7] Third Amended Complaint, ¶22. Trial on the Third Amended Complaint was held before the Court on December 13 -14, 2010 (heretofore and hereinafter, the "Trial"). At the Trial, prosecuted by the Plaintiffs on the

---

[6]The Third Amended Complaint followed the Court's consideration and determination of the Defendants' *Motion to Dismiss* (*inter alia*, the CUPTA claim), ECF No. 44. *See* Margin Order, ECF No. 51.

[7]Like the Third Amended Complaint, ¶22, both the Amended Complaint, ¶23, ECF No. 3, the further Amended Complaint, ¶23, ECF No. 35, and the Second Amended Complaint, ¶23, ECF No. 37, sought relief pursuant to §523(a)(2)(B). The Plaintiffs' Post-Trial Brief, ECF No. 79, cites §523(a)(2) without specific reference to any subsections but, at p.3, footnote 2, does refer to the "legal analysis with regard to discharge of debt, pursuant to §523" in the Plaintiffs' Pre-Trial Brief, ECF No. 78 (*citing* §523(a)(2)(A) at p. 13). The Plaintiffs' proof at trial and legal arguments were clearly founded on §523(a)(2)(A), and the Defendants treat the Third Amended Complaint as seeking relief pursuant to §523(a)(2)(A). *See* Defendants' Post-Trial Brief, ECF No. 80, p. 2. The case was tried without objection from the Defendants on the basis of fraudulent statements, orally and in writing, involving "other than a statement respecting the debtor's or an insider's financial condition;" *see* §523(a)(2)(A) and (B)(ii) (applicable to a written statement "respecting the debtor's or an insider's financial condition"). In light of the above, the Court treats the Third Amended Complaint, as tried, as seeking relief pursuant to subsection (A) of §523(a)(2). Assuming, *arguendo*, that the Plaintiffs continue to rely on §523(a)(2)(B) as a statutory basis for their requested relief, the Court finds no evidence in the record of the requisite materially false statement in writing respecting the Debtors' or an insider's financial condition.

basis of §523(a)(2)(A),[8] the Court, *inter alia*, received documentary evidence and heard the testimony of the respective parties and other witnesses.

On January 21, 2011, the Plaintiffs filed their post-trial brief, ECF No. 79. The Debtors filed their post-trial brief on January 26, 2011, ECF No. 80, and reply briefs were thereafter filed by both parties, ECF Nos. 83 and 85. The Court set oral argument on the matter for February 1, 2010, which was continued until February 22, 2011. Following oral argument, the Court took the matter under advisement, and now issues its Memorandum of Decision.

**B. Factual Background**

Pursuant to Fed. R. Bankr. P. 7052, the Court finds the following facts to be undisputed or otherwise supported by the evidentiary record. Additional and more specific findings of facts applicable to the specific allegations in the Third Amended Complaint are set for in the discussion of those claims, *infra*.

1.    On April 5, 1977, the Debtors purchased the Property from a developer, Flagler Associates. Anthony M. Gallicchio (hereinafter, "Gallicchio") was a partner in Flagler Associates. The original warranty deed conveying the Property to the Debtors contained the following language: "Together with the right in common with others to pass and repass over all passways shown on said map," and referenced a map "on file as Map No. 1848 in the Town Clerk's Office in said Town of Newington . . ." (hereinafter, the "Map"), *se*e Defendants' Exh. 9.

---

[8] *See, e.g.,* Rule 15(b)(2), Fed. R. Civ. P., applicable in adversary proceedings pursuant to Fed. R. Bankr. P. 7015 ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.")

2.    The Map depicts numerous passways (also known as "bridle paths")[9] in and around the Bridle Path Estates development, of which the Property is labeled as Lot 7.

3.    The Debtors sold the Property to the Plaintiffs on March 31, 2004 (hereinafter, the "Closing").

4.    The warranty deed conveying the Property from the Debtors to the Plaintiffs, dated March 31, 2004, does not contain the foregoing language in ¶1, above, deeding the right to pass and repass over the bridle paths that the Debtors' original deed contained.

5.    In connection with their efforts to sell the Property, the Debtors made written representations concerning the Property through their responses in completing an Owner's Affidavit, Owner's Special Title and Survey Report, MLS Listing, and DCP Disclosure Report.

6.    The Debtors also provided information to their agent, Realty 3 Carroll & Agostini (hereinafter, "Realty 3"), that the Property had "assigned parking," a feature which Realty 3 thereafter included in the MLS listing for the Property in Greater Hartford County.

7.    Prior to the actual purchase of the Property, the Plaintiffs, accompanied by their real estate agent, Ms. Bailey, visited the Property (hereinafter, the "Viewing") in connection with which Mrs. Botticello responded verbally to questions asked by the Plaintiffs and Ms. Bailey. These questions and responses related, *inter alia*, a parking area assigned for parking by the Debtors' tenants (hereinafter, the "Parking Area"), and certain boundary lines related to the Property.

8.    At no time, including at the Viewing and/or Closing, did Mrs. Botticello

---

[9]   The particular bridle path bordering the Property is hereinafter referred to as the "Bridle Path."

represent to the Plaintiffs and/or Ms. Bailey that the Debtors owned the Parking Area or the Bridle Path.

9.    On the evening before the Closing, Mrs. Karanian, a neighbor, told Mrs. Botticello that she had purchased the Bridle Path. Mrs Karanian also asked Mrs. Botticello for the phone number of the Botticellos' attorney, and was provided with the phone number.

10.    As of the date of the Closing, contrary to her statement to Mrs. Botticello, Mrs. Karanian did not own the Bridle Path. Rather, Mrs. Karanian had apparently "purchased" parts of the Bridle Path to the south and west of her own property (the portions being located to the north and west of the Property) from representatives of an entity known as Kitts Lane Associates. Kitts Lane Associates, however, did not own the Bridle Path. *See, Plaintiff, Gavino Cartiera and Malgorzata Cartiera's Trial Brief*, ECF No. 78, p. 9, fn. 1.

11.    After being told by Mrs. Karanian that she had purchased the Bridle Path, and providing Mrs. Karanian with the telephone number of their attorney, Mrs. Botticello telephoned the office of their attorney, and inquired as to whether Mrs. Karanian had called. While the evidentiary record leaves further details of this telephone call vague, it is clear that the telephone call to their attorney's office resulted in the Debtors' belief, and specifically Mrs. Botticello's belief, that Mrs. Karanian's purported purchase of Bridle Path was irrelevant and immaterial to the Closing on the Property and did not present a problem related to the Closing. Moreover, the call resulted in Mrs. Botticello's belief that there was no need or reason for her to inquire further, or take any other action, regarding her conversation with Mrs. Karanian.

12.     At no time prior or incident to the Closing, did Mrs. Botticello advise the Plaintiffs of her conversation with Mrs. Karanian.

13.     As of the Closing, no ownership dispute had ever existed between the Debtors and anyone else as to the Property.

14.     As of the Closing, the Debtors believed they had the right to use, and in fact did have a deeded right to pass and re-pass over the Bridle Path.

## IV.  DISCUSSION

### A. The Bankruptcy Discharge

In order to provide "honest but unfortunate" debtors a "fresh start," the Bankruptcy Code enables such debtors to discharge certain debts. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107 (2007) (*quoting Grogan v. Garner*, 498 U.S. 279, 286, 287, 111 S.Ct. 654 (1991)).  A debtor in a Chapter 7 case receives a discharge of debts under the authority of Section 727(b) of the Bankruptcy Code, which provides, in relevant part, that "*[e]xcept as provided in section 523* of this title, a discharge . . . discharges the debtor from all *debts* that *arose before the date of the order for relief* under this chapter . . . ." (emphasis supplied).

A bankruptcy discharge has the following effects, *inter alia*:

> (1)  [it] voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 . . . of . . title [11] . . . [and]

> (2)  [it] operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . .

11 U.S.C. § 524(a) (1993).

**B. Bankruptcy Code Section 523(a)(2)(A)**

In this adversary proceeding, the Plaintiffs seek a determination of nondischargeability of certain alleged debts under the standards of Bankruptcy Code Section 523(a)(2)(A). Because "[t]he consequences to a debtor whose obligations are not discharged are considerable . . . , exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Denton v. Hyman (In re Hyman*), 502 F.3d 61, 66 (2d Cir. 2007) (citations omitted). *See also Bethpage Fed. Credit Union v. Furio (In re Furio),* 77 F.3d 622, 624 (2d Cir. 1996), ("Exceptions to dischargeability are 'narrowly construed against the creditor's objections and confined to those plainly expressed in the [Bankruptcy] Code.'")*, quoting, Household Finance Corp. v. Howard (In re Howard),* 73 B.R. 694, 700 (Bankr. N.D.Ind. 1987).

Bankruptcy Code §523(a)(2)(A) provides, in pertinent part, as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>
> * * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> * * *

11 U.S.C. 523(a)(2)(A) (West 2010).

**C. Elements Required to Establish a Nondischargeable Debt Pursuant to Section 523(a)(2)(A)**

To establish that a debt is nondischargeable under § 523(a)(2)(A), a plaintiff must prove:

10

(1) the debtor made a false representation [or contributed to the false pretense, or committed an actual fraud];

(2) that at the time the debtor knew the representation or pretense was false, or his conduct was fraudulent;

(3) that the debtor made the representation [or contributed to the false pretense, or committed actual fraud] with the intention and purpose of deceiving the creditor or inducing the creditor to act to his or her detriment;

(4) that the creditor relied on the representation [or false pretense] to his or her detriment; and

(5) that the false representation [or false pretense, or actual fraud] was the proximate cause of the creditor's loss.

*Resolution Trust Corp. v. Roberti (In re Roberti)*, 183 B.R. 991, 1005 (Bankr. D.Conn. 1995) (citations omitted, bracketed language added); *see also In re Bugnacki*, 439 B.R. 12, 25 (Bankr. D.Conn. 2010). Thus, §523(a)(2)(A) provides three separate bases for non-dischargeability of a debt: (i) false representation, (ii) false pretenses, and (iii) actual fraud. These terms of art were used by Congress to incorporate the *general* common-law of such torts; *i.e.* the "dominant consensus" of jurisdictions, rather than the specific law of any given State. *Field v. Mans*, 516 U.S. 59, 70 fn. 9, 116 S. Ct. 437 (1995).

These terms and phrases as used in §523(a)(2)(A) and/or required as part of the elements to be proven for a determination of nondischargeability as discussed hereinafter, have the following meanings:

1. *False Representation*

A "false representation" involves an express fraudulent statement and is established where a debtor makes a false statement, knowing it to be false, with the purpose of deceiving the creditor or of inducing the creditor to act to his detriment in reliance thereon. *See, e.g.*, Restatement (Second) of Torts § 525 (1977); *In re Roberti* at 1005.

11

In addition, a party who conceals material information with the intention of preventing another from acquiring it is subject to the same liability as one who makes a "false representation". *See, e.g.*, Restatement, *supra*, at § 550. And a party to a business transaction who fails to disclose to another party a fact that he knows may justifiably induce that party to refrain from entering into a business transaction is subject to the same liability as one who makes a "false representation". *See, e.g.*, Restatement, *supra*, at §551.

2. *False Pretense*

As distinguished from a false representation, "false pretense" involves a misrepresentation *implied* from purposeful conduct intended to create a false impression. *See, e.g.*, Am. Jur. 2d Bankruptcy § 3064 (1991). *In re Miller*, 282 B.R. 569, 575 (Bankr. D.Conn. 2002) (false pretenses not found where evidence supported that party "*neglected* to make full disclosure . . .*, not that he engaged in purposeful conduct by which he *intended* to create a false impression.")   The implication arises when a debtor, with the intention to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, by which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit. . . ." *Liddell v. Peckham (In re Peckham)*, 442 B.R. 62, 74 (Bankr. D. Mass. 2010), (*quoting*, *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D.Ill. 1996)).

3. *Actual Fraud*

"Actual fraud" is any intentional deceit, artifice, trick, or design used to circumvent and cheat another, *i.e.* something said, done, or omitted with the design of perpetrating what is known by the debtor to be a deception. *See, e.g.*, Am. Jur. 2d Bankruptcy § 3065

(1991).

## D. Burden of Proof

The burden is on the party seeking nondischargeability to establish each of the elements of §523(a)(2)(A) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). ("[I]t is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions.") *Id.* at 288. In order to be awarded an exception from discharge under §523(a)(2), a creditor must prove each statutorily enumerated element of fraud by a preponderance of the evidence. *Id.* at 286-287*;* "[O]nce a creditor establishes a prima facie case of fraud, the burden of coming forward with some proof or explanation of the alleged fraud shifts to the debtor." *Carini v. Matera (In re Matera)*, 592 F.2d 378, 380-81 (7th Cir. 1979) (per curiam) (*citing In re Taylor*, 54 F.2d 1370, 1373 (9th Cir. 1975)); *see also, National Bank of North Am. v. Newmark (In re Newmark)*, 20 B.R 842, 853 (Bankr. E.D.N.Y. 1982).

## E. Analysis of the Debtors' Alleged False Pretenses, False Representations, and Fraudulent Conduct

The Court's analysis of the various factual claims made in the Third Amended Complaint is needlessly burdensome as that Complaint, like the four prior complaints, is not structured in accordance with Fed. R. Civ. P. 10(b),[10] applicable to this proceeding by Fed. R. Bankr. P. 7010. Rather, in connection with the sale of the Property the Plaintiffs

---

[10]Fed. R. Civ. P. 10 provides, in pertinent part:
"FORM OF PLEADINGS
* * * *
(b) PARAGRAPHS; SEPARATE STATEMENTS. A party must state is claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. ***
 If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . . must be stated in a separate count . . . ."

allege that the Debtors knowingly made (i) multiple false written statements, (ii) several oral misrepresentations, and (iii) perpetrated an actual fraud by way of their intentional "silence" arguing each such statement, misrepresentation and actual fraud constitutes a separate basis for determining the alleged debt nondischargeable. The Plaintiffs allege they relied on these alleged misrepresentations (and silence) which led them to wrongly believe that the sale of the Property included "assigned parking" located on the Bridle Path, as a consequence of which, the market value of the Property was substantially less than what they paid; they lost use of the disputed property and were forced to incur substantial additional expenses, including costs for a survey, attorneys' fees and other costs that arose in connection with a lawsuit they filed seeking to quiet title to the disputed property. An individual discussion of each of these alleged false statements, misrepresentations and the Debtors' fraud by "silence",as though set forth in separate counts, follows.

   *1. Alleged False Written Representations – the Debtors' Written Responses to Questions in the Owner's Affidavit, the Owner's Special Title and Survey Report, the DCP Disclosure Report and the MLS listing.*

   The first basis claimed by the Plaintiffs in support of nondischargeability implicates certain written responses made by the Debtors to questions in the Owner's Affidavit, the Owner's Special Title and Survey Report, and the DCP Disclosure Report. Initially, the Court observes that while the Debtor's relevant answers are simple (*i.e.*, "None", "No"), the questions are not. Generally, an appraisal of the existence of a false statement, knowingly made, with intent to deceive – three of §523(a)(2)(A)'s requisite elements – is easier if the relevant response was to a simple, focused question.  Not only are the questions here compound, but in many instances, informed answers to the relevant question necessarily involved an appreciation of certain legal terms, *inter alia*, "easement", "improvement",

14

"encroach(es)", and "structures." Compound questions with integrated legal terms have the

practical effect of raising the Plaintiffs' burden of proof as to the false statement appraisal

calculus in that the requisite elements of §523(a)(2)(A) require a determination of  the

clarity of the question in the mind of the respondent.

The Plaintiffs' claims of instances of Debtor conduct involving false written

representations are as follows:

(1) representations made by the Debtors in their Owner's Affidavit and Owner's
Special Title and Survey Report, dated March 31, 2004, *see* Plaintiffs' Exh. P; and

(2) a certain representation by the Debtors in the Multiple Listing Service
(hereinafter, "MLS") listing for the Property stating that the Property had "assigned parking,"
*see* Plaintiffs' Exh. II; and

(3) the Debtors' response of "No" in the Connecticut Department of
Consumer Protection Residential Property Condition Disclosure Report for 28-30 Spur
Lane, dated March 7, 2004 (hereinafter, the "DCP Disclosure Report"), in response to
Question #2, "Does anybody other than yourself have any right to use any part of your
property, or does anybody else claim to own any part of your property?" *See* Plaintiffs' Exh.
M.

The Court addresses each of these alleged false written representations in turn.

(a)  Owner's Affidavit, Section (E)

The Plaintiff's alleged that in the Owner's Affidavit, the Debtors responded "No" to

the following statement:

(E) Easements: As of today, to the best of my/our knowledge,
none of  the  present improvements on the land encroach upon
any easements affecting this property.

The Bridle Path was owned by an entity other than the Debtors as of the Closing,

and the Debtors had a deeded right to pass and repass over the Bridle Path. In other

words, the Debtors enjoyed an easement[11] over the Bridle Path.[12]  As no person (other than the Debtors) had the right to use or control the Property, or enjoyed a right of way over the Property, there were no easements as to the Property itself.

To the extent that the Debtors' easement to use the Bridle Path was an easement "affecting" the Property, the Plaintiffs failed to establish the existence of any improvements[13] on the Property that intruded, or extended upon the Bridle Path. The Parking Area, and a portion of the sidewalk extending from the Parking Area to the Property,[14] arguably constitute improvements, but are not located "on the land," rather they are on the Bridle Path.[15]  Furthermore, the Parking Area and sidewalk do not *encroach*[16] upon the Bridle Path (or any easement related thereto) as they were installed lawfully by or with the permission of Gallicchio, who owned the Bridle Path at the time.

There is simply no credible evidence and no basis in the record to find that the Debtors' representation that there were no "improvements on the land [that] encroach upon

---

[11]An easement is defined as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)."  Black's Law Dictionary 548, 8th ed. (2009).

[12]As already noted, with respect to the Property actually conveyed to the Plaintiffs, the deed from the Debtors conveying the Property to the Plaintiffs did not mention the easement over the Bridle Path. Neither party was able to explain the omission.

[13]Generally, an "improvement" is "[a]n addition to real property, whether permanent or not; esp., one that increases its value or utility or that enhances its appearance."  Black's Law Dictionary 773, 8th ed. (2009).

[14]Although the Owner's Special Title and Survey Report explains via parenthetical that "encroach" means "is partially located," no such parenthetical exists on the Owner's Affidavit.

[15]The evidence produced at Trial failed to establish the extent to which a wood pile or clothesline pole constitute improvements located on the Property, or the extent to which they intruded or extended upon the Bridle Path. A portion of a garden appears to be partially located on the Property, with the balance on the Bridle Path.

[16]"[E]ncroach" means "[t]o gain or intrude *unlawfully* upon another's lands, property, or authority" Black's Law Dictionary 568, 8th ed. (2009) (emphasis added).

any easements affecting this property" was considered or known by them to be false when made, or was made with the intention and purpose of deceiving the Plaintiffs. Based upon the entire record, and the Court's assessment of the demeanor and credibility of the witnesses, including the credible testimony of Mrs. Botticello, the Court finds the opposite, that the Debtors' believed their response to Statement E on the Owner's Affidavit was truthful.

(b)    Owner's Special Title and Survey Report, Question 3

On the Owner's Special Title and Survey Report, the Debtors responded "No" to the following Question 3 :

> During the time you have been the owner or one of the owners of the Property, has anyone claimed to have any interest in your Property or any easement or right-of-way on or across your Property which you dispute and do not recognize as being a valid claim?

Distilled to its essence, this question is compound but in two simple respects. "[H]as anyone claimed to have any interest *in your Property*?"  "[H]as anyone claimed . . . any easement or right-of-way on or across *your Property*?" There is no evidence of another's claim of interest in the Property; and no evidence of an easement or right of way on or across the Property. The Plaintiffs have presented no evidence that the Debtors' negative response to Question 3 on the Owner's Special Title and Survey Report, was false, considered or known by them to be false when made, or was made with the intention and purpose of deceiving the Plaintiffs. The Court finds the opposite, that the answer "No" to Question 3 on the Owner's Special Title and Survey Report was true, and the Debtors' believed their response was truthful at the time it was made.

(c)   Owner's Special Title and Survey Report, Question 4

On the Owner's Special Title and Survey Report, the Debtors responded "No" to the following Question 4 :

> During the time that you have been the owner or co-owner of the Property, has there been any dispute with other persons over the location of any or [sic] your boundary lines?

The Debtors' testimony at Trial, corroborated by the testimony of several of the Debtors' former neighbors, clearly established that during the time of the Debtors' ownership of the Property, the Debtors had no disputes with others regarding the location of the Property's boundary lines.[17]

While Mrs. Botticello, as a result of her conversation with Mrs. Karanian, knew that she claimed ownership of the Bridle Path, *albeit* falsely at the time, that conversation did not affect the Property's boundary lines, and certainly created no dispute as to those lines.

Mrs. Botticello appears to have considered the future possibility that a transfer of ownership of the Bridle Path might implicate the easement to use the Bridal Path, notwithstanding her deeded right thereto, and the continued consensual use of the Parking Area. However, Mrs. Karanian's statement triggered, at most, an unripe, potential dispute not concerning the Property's boundary lines, not the existence of a prior dispute concerning those boundary lines as posed by the question.

The Trial record reflects no evidence to support a finding that the Debtors' negative response to Question 4 on the Owner's Special Title and Survey Report was false, known by the Debtors to be false when made, or was made with the intention and purpose of

---

[17]Subsequent to their purchase of the Property, the Plaintiffs disputed the boundary lines of the Property with the Karanians, their neighbors to the north, but this dispute was not in existence during the time of the Debtors' ownership of the Property.

18

deceiving the Plaintiffs. The Court finds the opposite.

(d)   Owner's Special Title and Survey Report, Question 5

On the Owner's Special Title and Survey Report, the Debtors responded "No" to

the following Question 5 :

> Do you know or have reason to believe that any building or other structure on your land (including patios, porches, stoops, etc.) encroaches (is partially located) on any adjoining property or onto or within the boundaries of any easement on your Property?

The Trial record does not reveal the existence of any buildings or other structures

including patios, porches, or stoops, on the Property that "encroaches," or "is partially

located" on adjoining property. To the extent that the sidewalk, garden or wood pile, may

be viewed as a "building or other structure" partially located on adjourning property, the

Court finds no evidence to support a finding that the Debtors' considered or knew their

answer to be to be false when made, or responded "no" to Question 5 on the Owner's

Special Title and Survey Report with the intention and purpose of deceiving the Plaintiffs.

The Court finds the opposite, that the Debtors' believed their response was truthful.

(e)   Owner's Special Title and Survey Report, Question 6

On the Owner's Special Title and Survey Report, the Debtors responded "No" to the

following Question 6 :

> Do you know or have  reason to believe that any part of a neighbor's building, fence, wall, hedge or driveway encroaches (is located in part) on your Property?

Gavino Cartiera testified that he noticed hedges and bushes on the Bridle Path which

extended onto the Property, Hearing Tr., December 13, 2010, at 3:37:21, and that may

have been the case.   However, considering the Debtors' right to use the Bridle Path, it is

not likely that they would have noticed any minor encroachment of shrubbery, or even thought about such a minor encroachment. Consequently, it appears to the Court, and the Court so finds, that the Debtors' response to this question was truthful and was not attended by any intent to deceive.

(f)    The Debtors' Representations in the DCP Disclosure Report

The Plaintiffs contend that it was fraudulent for the Debtors to respond "No" in the DCP Disclosure Report to Question #2.

> Does anybody other than yourself have any right to use any part of your property, or does anybody else claim to own any part of your property?

The Plaintiff's presented no evidence of another's right to use any part of the Property, or that "anybody else claim[ed] to own any part of" the Property. The Court finds the opposite, that the Debtors believed their response to Question #2 in the DCP Disclosure Report was truthful, and was not attended by any intent to deceive.

(g)    The Debtors' MLS Representations

Lastly, the Plaintiffs assert that the Debtors' representations in the MLS listing for the Property, and specifically the representation that the Property had "assigned parking," was fraudulent. At all times prior to the Closing the Debtors' had the Bridle Path owner's permission and consent to use the Parking Area, and they in turn designated that area as parking space for their tenants. The relevant inquiry concerning the statement in the MLS listing that "assigned parking" was associated with the Property is whether such statement was true *at the time it was made*, and the Court finds that it was. Therefore, the reference to "assigned parking"  contained within the MLS listing fails the second component of the test for nondischargeability under 523(a)(2)(A), "that at the time the debtor knew it was

20

false." *In re Roberti*, 183 B.R. at 1005. In addition, the Court finds no intent to deceive in connection with the answer to this question.

### (2).  Alleged False Oral Representations

The second broad basis claimed by the Plaintiffs in support of nondischargeability implicates oral representations, allegedly made by the Debtors to the Plaintiffs and to Ms. Bailey at the Viewing. At the outset the Court notes that the Viewing occurred well before Mrs. Botticello's conversation with Mrs. Karanian. Accordingly, that conversation is not part of the §523(a)(2)(A) calculus as applied to any oral representation made by Mrs. Botticello at the Viewing.

Specifically, the Plaintiffs claim that as they were viewing the Property, they and Ms. Bailey made various inquiries of the Debtors, specifically of Mrs. Botticello, in response to which she allegedly said,  (1) "that a second driveway, parking area, and a sidewalk to the west of the property, and leading to the driveway parking area, were part of the property being sold;" (2) "that the northerly boundary line of the property ran in a straight line from a fence at the northeast corner of the property, along a row of hemlock trees along the northerly boundary of the property, which included an area where firewood was stored by the Botticellos;" and (3), "that the rear property line ran along a chain link fence," *Plaintiff, Gavino Cartiera and Malgorzata Cartiera's Trial Brief*, ECF No. 78, at 4.

### (a ) Mrs. Botticello's Oral Statements Concerning The Second Driveway, Parking Area, and Sidewalk

Based upon the record, the Court finds that with respect to the second driveway, Parking Area, and sidewalk, Mrs. Botticello did not make false representations or contribute to false pretenses at the Viewing.  The Plaintiffs arrived at the Property for the Viewing with

a set of expectations about its parking situation that were neither communicated to the

Debtors nor effectively flushed out through their inquiries of and responses by the Debtors.

To wit, as Gavino Cartiera testified:

> When we were viewing properties, we were looking for the ability to have separate parking for the tenants . . . so when I saw the assigned parking feature [on the Realtor.com MLS listing for the Property], *that indicated to me* that there was some sort of separate parking for the tenants.

Hearing Tr., December 13, 2010, at 10:45:08 (emphasis added).

The relevant inquiry is not what the Plaintiffs' expected, rather it is the veracity of Mrs.

Botticello representations.  At the outset the Court finds that Mrs. Botticello's answers to the

Plaintiffs' and Ms. Bailey's questions were truthful. Nevertheless, the Court appreciates that

under the circumstances her answers may have contributed to a misunderstanding between

the parties.  This misunderstanding is evidenced by the parties' differing accounts of the

conversation.  For example, Mr. Cartiera testified that Ms. Bailey

> inquired as to the parking area and said, you know, "Does that area belong to your property?"  . . and Hannah [Botticello] said, "Yes, it does. As a matter of fact, those vehicles that are parked there are our cars."

Hearing Tr., December 13, 2010, at 10:56:23.

On the other hand, Mrs. Botticello testified that the Cartieras and/or their agent (Ms.

Bailey)

> asked a question about where do the tenants park? And I indicated to them that, the spot where the two cars was [sic] is where my tenants park, but that was part of the bridle path and that we had paid the Gallicchio's to put that driveway in for us, but never indicated to him that that was our property, and I explained to them that there was a bridle path that ran around the whole development . . . but I did indicate that the driveway was part of the bridle path.

Hearing Tr., December 14, 2010, at 10:47:28.

While the Court finds the testimony of Mr. Cartiera generally credible, the Court does not credit his specific assertion that Ms. Bailey asked if the Parking Area was part of the Property ("Does that area belong to your property?"). Rather, the Court finds credible the testimony of Mrs. Botticello insofar as the question asked by Ms. Bailey was "Where do the tenants park?" and her response "[t]he spot where the two cars [are] is where my tenants park," or words to that effect. Given the Plaintiffs stated interest in purchasing property with tenant parking, it is more logical that they and/or their agent would have inquired as to the location of that parking, rather than asking if the Debtors owned the area where the tenants parked.

However, the Court does not find credible the further testimony of Mrs. Botticello that her response included a detailed explanation of the Bridle Path, and the relationship of the Parking Area to the Bridle Path. In addition to being overly detailed and largely unresponsive to the question posed, the additional wording claimed to have been spoken by Mrs. Botticello has the semblance of a legal argument developed over the course of the present litigation and merged with her memory of the event through the passage of time.[18]

Distilled to its essence, the Court finds that Mrs. Botticello was asked "where do the

---

[18]The Court's failure to credit the testimony of Mrs. Botticello in its entirety should not be read as a finding that Mrs. Botticello knowingly and/or intentionally testified falsely. The testimony of both parties was impacted by the prolonged nature of their dispute and related litigation, and the resultant innocent blending of faded memories with strong litigation positions and the natural tendency to bolster one's position. Indeed, while disregarding this part of Mrs. Botticello's testimony, but having observed her demeanor and actual testimony, considered her motives, sincerity and conscience, and notwithstanding certain inconsistencies in her deposition testimony as pointed out by the Plaintiffs', the Court finds Mrs. Botticello to be a credible witness. See Patrick v. LeFevre, 745 F.2d 153, 159(2d Cir. 1984)("determining a man's state of mind is an awesome problem, capable of resolution only by reference to a panoply of subjective factors. Furthermore, a sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ . . . .") (citations and internal quotation marks omitted).

23

tenants park," or words to that effect, to which she simply and truthfully responded "over there" (pointing toward the Parking Area), or words to that effect.

## 2.   The Northern and Eastern Boundary Lines of the Property

The Plaintiffs allege that Mrs. Botticello misrepresented that the northerly boundary line of the Property "ran in a straight line from a fence at the northeast corner of the property, along a row of hemlock trees along the northerly boundary of the property, which included an area where firewood [wood pile] was stored by the Botticellos;" *Plaintiff, Gavino Cartiera and Malgorzata Cartiera's Trial Brief*, ECF No. 78, at 4, and that a chain link fence constituted the easterly boundary of the Property.  However, the Plaintiffs did not establish that Mrs. Botticello actually used these specific words. In her deposition, Ms. Bailey testified as to her conversation with Mrs. Botticello:

> * * *
>
> She said the side line comes down the side where the trees line, following the tree line, across the open grass area all the way over to the stockade fence on the next house.
>
> * * *
>
> Q: And what did you understand regarding the fence . . . as to the boundary line for the rear of the property?
>
> Ms. Bailey: The chain link fence was the boundary line.

*Id*. at 6-7 (citing *Dep. Tr. of Jeanne Bailey*, p. 19, lines 8-19, and p. 24, line 24 to p. 25, lines 1-13).  At the outset, the Court notes the obvious, that the final question posed solicited Ms. Bailey's "understanding" as to the boundary line, not what Mrs. Botticello actually stated.[19]

---

[19]This testimony is typical of the Plaintiffs' presentation of evidence which focused in many instances not on what was actual stated or represented, but rather on what they or another understood to be the case. For example, when questioned what she *understood* the Property to include relevant to the location of a certain wood pile,  Ms. Bailey testified at her deposition that the wood pile "would be on the property" , *Dep. Tr. of Jeanne Bailey*, p. 24, line 24 to p. 25, lines 1-13.

Considering Mrs. Botticello's vantage point at or near her front steps and out of sight of the portions of the Property's boundary lines, and the chain link fence, it is clear that Mrs. Botticcello was orally describing, not walking and pointing out specifically, the Property boundary lines.[20] In describing the Northern Property boundary Mrs. Botticello used the phrase "down the side where the trees line." However, there were actually two tree lines. Ms. Bailey and the Plaintiffs, who were standing closer to the corner of the house with a view of both tree lines, appear to have interpreted and understood her to mean the furthest tree line - the one on the opposite side of the Bridle Path. Having considered the testimony of Mrs Botticello, reviewed the photographic evidence in Plaintiffs' Exh. G, and in light of the corroborating testimony from Ms. Bailey that Mrs. Botticello *pointed* in the direction of the boundary lines, the Court finds and concludes that Mrs. Botticello was just as likely describing a line of trees that ran in a straight line along the Northern side of the Property, rather than a line of evergreen trees on the opposite side of the Bridle Path. Upon the record, the Court concludes that Mrs. Botticello's oral description of the boundary lines involved neither an intentional misrepresentation or conduct by her intended to create a

---

[20]Mr. Cartiera testified, "We [Mr. Cartiera and his agent, Ms. Bailey] both have said that Hannah was at the front door." Hearing Tr., December 13, 2010, at 4:42:52. Mr. Cartiera further testified that "she escorted us a partial way from the home to the side of the home, uh, but she then proceeded to point to the boundary lines so we did not actually walk over to the corner of the Property . . . ." Hearing Tr. at 4:43:24. Ms. Bailey testified in her deposition that at the Closing, Mrs. Botticello "pointed out specifically that side – that was the side that was less apparent – coming down a tree line following over to a stockade fence. . . ." Dep. of Ms. Bailey, p. 18, lines 11-20. Mrs. Bailey testified the she never left the front stoop.

The Court finds that in describing the boundaries, Mrs. Botticello stood on her front stoop or halfway between her front stoop and the corner of her house. The Court finds that the testimony of the Plaintiffs and Ms. Bailey, taken together with the testimony of Mrs. Botticello, corroborates that Mrs. Botticello pointed in the direction of the wood pile and the stockade fence. However, the Court finds that from a vantage point at or near the front stoop of her house, the pointing could equally refer to the actual corner of the Property in front of the wood pile, and the actual corner of the Property prior to the stockade fence. In addition, an examination of Plaintiffs' Exh. G shows that a line of trees bordering the Bridle Path existed along the Debtors' Property, parallel to the line of trees located on the Karanian's property on the opposite side of the northern Bridle Path.

false impression. It is the Plaintiffs' burden to establish otherwise, and they have not done so.

Moreover, the Plaintiffs have failed to establish the fourth requisite of § 523(a)(2)(A) - that their reliance was justifiable[21]. While Connecticut law holds that a purchaser "is under no obligation to investigate or verify statements, to the truth of which, the other party to the contract, with means of fuller knowledge, has deliberately pledged his faith," *Loverin v. Kuhne,* 94 Conn. 219, 224 (1919), the United States Supreme Court has held that in the context of justifiable reliance, a person "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437 (1995)(citations omitted); *see also Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 286, 285 A.2d 451(1971) ("A misrepresentation as to the subject of a proposed sale will not support an action for deceit if the subject be open to the buyer's observation") (internal citations and quotations omitted); *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1145 (3d Cir. 1993) (acknowledging that while a "real estate sale purchaser has no obligation to examine public zoning records prior to a purchase," he "should have recognized the need to inquire further as to [a matter] . . . from reading the documents that were given to him")(citations omitted).

Although under no obligation to do so under Connecticut law, the Plaintiffs had the opportunity to examine the land records available at the town clerk's office, which would have readily disclosed that the Bridle Path was separate land and constituted the true

---

[21]The Plaintiffs' reliance on a false representation must be "justifiable" under the circumstances. *See Field v. Mans*, 516 U.S. 59, 73 -75, 116 S.Ct. 437 (1995).

boundary of the Property. Even so, no separate trip to the town clerk's office was necessary to disclose the existence of a 15-foot passway as the northerly and easterly boundaries of the Property.  Mr. Cartiera acknowledged that he "skimmed" the deed to the Property prior to the Closing.  Hearing Tr., December 13, 2010, at 2:59:09.  Attached to the deed is a certain "Schedule A" which describes the metes and bounds of the Property conveyed, including the following language:

> which map is on file as Map No. 1848 in the Town Clerk's Office in said Town of Newington . . . .  Said premises are more particularly bounded and described as follows:
> NORTHERLY: By fifteen-foot passway, as shown on said map . . . .
> * * *
> EASTERLY:  By fifteen-foot passway, as shown on said map . . . .

Schedule A, Defendants' Exh. 4a.

Even a cursory glance at Schedule A of the deed for the Property would show that it is bounded to the North and to the East by a fifteen-foot passway. As such, the Plaintiffs "should have recognized the need to inquire further  . . . from reading the documents that were given to [them]," *Wittekamp*, *supra*, 991 F.2d at 1145. Moreover, as an attorney, Mr. Cartiera can be assumed to have a greater understanding of the significance of legal documents placed before him than that of an average person.

The Plaintiffs were on clear notice that a fifteen-foot passway existed around and constituted the Northerly and Easterly boundaries of the Property.  Thus, it was not justifiable for the Plaintiffs, one of whom is an attorney, accompanied by a real estate professional,  to rely upon a imprecise general oral description by Mrs. Botticello that a tree line constituted the Northerly boundary, or her vague pointing in the direction of an Easterly boundary, given the specific description of the Bride Path as constituting those boundaries

in Schedule A.  A similarly sophisticated purchaser of real property, even one without a real estate or legal background, would have understood the approximate distance of fifteen feet, and that a "passway" -- the Bridle Path – defined the Properties boundaries.

*3.    The Debtors' "Silence" Regarding Mrs. Karanian's Statement that She had Purchased the Bridle Path*

It is undisputed that on the evening of the day prior to the Closing Mrs. Karanian, a neighbor, told Mrs. Botticello that she had purchased the Bridle Path bordering and located between their respective properties. While it is also clear that this statement was not then true, the Plaintiffs' assert that the Debtors' "silence" – specifically the Debtors' failure to advise them of this conversation at or prior to the Closing – is a basis for a determination of nondischargeability pursuant to § 523(a)(2)(A).

"It is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under §523(a)(2)(A)." *Harris v. George (In re George)*, 205 B.R. 679, 681 (Bankr. D.Conn. 1997) (*quoting  Fonfara v. Dowd (In re Dowd)*, 116 B.R. 26, 27-28 (Bankr. D. Conn. 1990)).

Specifically, Mrs. Karanian testified:

Q (Attorney Postman):    And did you approach Mrs. Botticello with regard to that subject area, the bridle path area?

A (Mrs. Karanian):    Yes.  As it turned out it was the evening before they were going to close, but I did tell her that I had purchased that land, and that I thought she should probably tell her lawyer. She gave me a lawyer's name, and I don't know whether it was hers or the purchaser's [Cartiera's] lawyer, but I gave it to my attorney, and he called the lawyer.

Hearing Tr., December 13, 2010, at 10:10:06.

First, Mrs. Karanian's statement that she had purchased the Bridle Path was not

28

true.[22] As of the Closing, there was no change in ownership of the Bridle Path. Prior to the

Closing, the fact that Flager Associates was the owner of the Bridle Path, and continued to

be the owner, was clear.  And, as a practical matter, even if Mrs. Karanian's statement that

she had purchased the Bridle Path had been communicated to the lawyers[23] at the Closing,

it would have been known to be, or quickly ascertained to be, untrue.

Moreover, to the extent that the Debtors themselves had a duty to investigate, verify

and/or disclose the substance of Mrs. Karanian's statement regardless of its truth, the

Debtors' purposeful conduct shows an intent to discharge that duty rather than avoid it. The

Debtors immediately contacted their attorney's office and inquired of his office whether the

Closing would be affected by Mrs. Karanian's purchase of the Bridle Path.[24] Although a

phone call to one's attorney, without more, may not necessarily absolve a duty to disclose,

the Court finds that in this case it did as the call had the effect of causing the Debtors to

believe that there would be no problem in proceeding with the Closing, and that no further

action on their part was necessary.[25] There is no basis to conclude that the Debtors by their

silence as to the Plaintiffs themselves engaged in purposeful conduct by which they

intended to create a false impression. Under these circumstances, the Debtors' silence at

the Closing presents no basis for a determination of nondischargeability under

---

[22]Although a deed was eventually issued to Mrs. Karanian, as of the date of the relevant
conversation and that of the Closing she did not own the Bridle Path.

[23]Neither the closing lawyers nor Mrs. Karanian's lawyer (Charles Karanian, Esq.) testified at
Trial.

[24]  The Court finds credible the testimony of Mrs. Botticello that this call indeed took place, and
counsel for the Plaintiffs concedes that this call likely occurred.

[25]There has been no allegation or evidence to suggest that any representations by the Debtors'
attorney or his staff were fraudulent or that the Debtors had knowledge of any false representation made
by their attorney's office to support the imputation of liability under agency principles. *See generally, Nat.
Union Fire Ins. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296 (2d Cir. 1996).

§523(a)(2)(A).

## VI.  CONCLUSION

A careful, detailed examination of the Trial record reveals no representation, oral or in writing, made by the Debtors, individually or collectively, or "silence", attended by circumstances which satisfy the first three requisite elements of §523(a)(2)(A).[26] Nor was there reckless conduct.[27] Because the Plaintiffs have not established any of the first three elements of §523(a)(2)(A)[28] it is not necessary for the Court to determine whether the Plaintiffs have established the fourth and fifth elements – justifiable reliance[29] and proximate cause.

Simply stated, the present matter involves a series of preconceived beliefs, expectations, and mistaken assumptions concerning a real property transaction on the part of the Plaintiffs, but no purposeful Debtor conduct, or silence,  which rises to the level of a false pretense, false representation, or actual fraud necessary to a determination of nondischargeability under § 523(a)(2)(A).  In light of the absence of fraudulent statements know by the Debtors to be false, and absent indicia of purposeful and intentional conduct

---

[26]*See* discussion of the five elements of §523(a)(2)(A) at pp. 10-11, *supra.*

[27]Recklessness or reckless behavior can satisfy the intent element of a § 523(a)(2) claim.   "To prevail on a false pretenses claim [under 11 U.S.C. § 523(a)(2)(A)], the creditor must show that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation." *In the Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995). *See also Household Credit Services, Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) ("reckless conduct could be sufficient to establish fraudulent intent,") and *In re Roberti*, 183 B.R. at 1006 ("This court and others have held that while a debtor's mere negligence would not support a finding of actual knowledge of falsity and intent to deceive, a showing of reckless indifference to the truth would suffice").

[28]Failure to prove even one of the five elements of §523(a)(2)(A) is fatal to a determination of nondischargeability pursuant to that section.

[29]*See*, nevertheless, brief discussion of justifiable reliance at pp. 26-28, *supra.*

by the Debtors to contribute to the Plaintiffs' misunderstandings concerning the Property, the Court concludes that the Plaintiffs have not sustained their burden of proving by a preponderance of the evidence facts sufficient to support a finding of nondischargeability under Bankruptcy Code Section 523(a)(2)(A), or any other subsection of §523(a)(2). Therefore, the Debt, if any, as set forth in the Third Amended Complaint is subject to the Debtors' discharge. A separate judgment to this effect enters simultaneously herewith.

Dated: September 26, 2012                         BY THE COURT



                                        Albert S. Dabrowski
                                        United States Bankruptcy Judge